All right. Good morning, everybody. We are in the First District Appellate Court, the Second Division. I'm Justice Terry Lavin presiding today with my colleagues, Justice Cynthia Cobbs and Justice Aurelia Puchinsky. And what we're going to do, as you may be aware, is we'll give you 10 minutes uninterrupted and then ask you some questions. And then there will be five minutes left for rebuttal at the end of all of it. And if we unduly burden you with questions, we might go a little bit longer. But, you know, whatever, we'll do the best we can. So good morning. And let's have counsel introduce yourselves, please. Certainly. I'm Jennifer Bontrager from the State Appellate Defender for Gilbert Feliciano. Okay. Good morning, Your Honors. My name is David Iskowich. I am an Assistant Co-County States Attorney and I am here on behalf of the people. Okay, let's hear from the appellant first. Certainly. Good morning, Your Honors, and may it please the court. Again, I'm Jennifer Bontrager for Gilbert Feliciano. I had planned to spend my time this morning talking about the first and the third issues raised in the briefs. But of course, I'm here for your questions. Okay. Your Honors, there's simply not enough evidence to establish that Gilbert Feliciano committed any criminal acts against Stanley Letkiewicz on October 11th, 12th or 13th 2010, or that Letkiewicz's death six weeks later was caused by Feliciano. The only evidence placing Gilbert at Letkiewicz's house sometime on the dates in question is a single hearsay statement from Letkiewicz. According to his neighbor, Francisco Del Angel, Letkiewicz told him Gilbert did this. But no physical or other evidence links Gilbert to the house or to any crimes. There's no fingerprints, no blood, no DNA, no confession. To be very clear, the broken basement window that the state talked about very much in its brief was not a point of entry into the home. It's a small window and only one pane of that small window was broken. It's not next to a door or any other point of entry, and it's far too small for a person to get through. Access to Letkiewicz's house was not made there. As to the purported damage to the door between the main floor and the basement, it's unknown when that happened. To be clear, this house, Letkiewicz's was in such disrepair that he had received numerous citations from the city for things including peeling paints, lead paint, mold, and clutter. Nor is there sufficient evidence, I'm sorry, even if Gilbert was in the house that day, his prior relationship with Letkiewicz just as equally supports an inference that he invited Gilbert in or that Gilbert otherwise believed he had permission to be there. Nor is there sufficient evidence of a robbery. Francisco said Letkiewicz claimed that Gilbert took his wallet and his money, but there's no evidence that a wallet or money were missing from the house. No one testified about searching for a wallet or any money, and none was recovered from Gilbert when he was later arrested. Finally, even if Gilbert was in Letkiewicz's home and even if he caused injuries to Letkiewicz's head, there's still insufficient evidence to establish beyond a reasonable doubt that those injuries occurred six weeks later. This is a case with an intervening cause of death, cardiac arrest, and acute gastrointestinal bleeding disconnected from any act by Gilbert's. The wounds from October were healing when Letkiewicz died. All the doctors agreed on this point. His death resulted from unrelated afflictions according to two separate doctors. Both the neurosurgeon who operated on Letkiewicz immediately before his death and Dr. Schumann, who reviewed all of Letkiewicz's medical records, agreed that Letkiewicz's death did not result from the October head injuries. The medical examiner Dr. Goldschmidt's opinion did not explain why or how the October injuries caused Letkiewicz's death six weeks later, particularly given that they were healing. He did not explain why Letkiewicz's heart problems, especially his underlying heart condition that had pre-existed any October injuries or the acute gastrointestinal bleeding did not cause his death, and without accounting for those in his opinion, his opinion is not The evidence is simply insufficient to sustain any of Gilbert's convictions beyond a reasonable doubt. Moving to the other crimes issue, the purpose for which the judge admitted the purported other crime here to show the relationship between the parties is not a valid basis for admitting other crimes evidence. Even more, the state did not establish that any other crime occurred. All the state introduced was Francisco and Maria's speculation that Gilbert caused the bruises they saw on Letkiewicz's arms. It was Gilbert himself who called the police when Francisco confronted him about this and accused him of causing these injuries, and police did not arrest or cite or charge Gilbert with anything related to that, related to any crime related to that incident. So this evidence essentially became speculation that was used as propensity, and certainly admitting the supposed other crimes evidence cannot be considered harmless. The state's entirely on those hearsay statements. There's no physical evidence, no forensic evidence, no proceeds, no confession, and substantial evidence of an intervening cause of death. Plus, the jury heard this evidence without limitation. Submitting this other crimes evidence was an error that requires a new trial. Do your owners have questions for me? My colleagues? Questions? Yes, Justice Puczynski? You've said the window was too small, but in fact, there was testimony that the window itself was two feet by three feet, and that the hole in the window was, I think, 12 inches by nine inches, but the hole was directly above a window lock, and the window was ajar. So why is it too small? Because even given the size of that window, it could only open as far as the half pane could go down. Gilbert is a six-foot-tall man who weighs over 200 pounds. He couldn't have fit through the half size of that window, based on the photos and the measurements. He simply couldn't have fit through that window. Was that evidence that was about the sizing of the window and his inability to fit, was that evidence that was presented at trial to rebut the charge? The photo was introduced. It was a state's exhibit. I believe the jury was left to draw its own conclusions about whether my client could fit through. I mean, certainly they were able to visibly see him in the courtroom, so they should have been able to do that math, but I don't know. No argument was made to the jury that he couldn't possibly fit through that window. I do believe counsel argued that he could not have fit through that window, but it was only a brief point in the closing. It was not counsel's focus. Counsel was focused more on, he wasn't really focused on the home invasion count. I'm sort of at a loss to understand why the statements made by the victim when he was rescued would not be admissible, pursuant to people versus Poland and many, many, many other cases. Well, I mean, the statement he made to Francisco when Francisco first found him, we did not challenge that statement. We agreed that that was an excited utterance and that it was admissible. But the other statements, once he was found and he was talking to the EMTs in the ambulance, the police who arrived later, the doctor who was treating him, those were all made after he was found, after the startling situation was over. There's no longer an ongoing emergency at that point. And those statements were made in response to questions and they were given to prove past events, which makes them testimonial. Right. He didn't know he wasn't going to die. He wasn't sure what his condition was. And there's no evidence that he knew that he was going to be okay. There's no evidence that anybody said, don't worry about it. You're going to be fine, Mr. Litzkevich. And the questions that were asked, Francisco asked, who did this? Alvarado either asked, who did this or what is that? It's what happened. It's unclear from the testimony. So it was either who or what, we don't really know. But Kim and Hernandez clearly just asked what happened. So the answers that he gave, I think, were perfectly insistent with what happened. Somebody asked him what happened and he told them what happened. So not knowing that he wasn't going to die, not knowing that he was going to come through it and live for another 41 days, why wouldn't that be an excited utterance? Why isn't an extension of that same event? Well, I think because the emergency nature of it had already passed. And I think you're talking also about them being dying declarations, which they weren't admitted as dying declarations. I'm not talking about dying declarations at all. I'm talking about extending the excited utterance for the whole time that he was excited about something that had happened to him. And he didn't know what his situation was. So he was concerned about it. He was obviously in pain. And I think that that extends the excited utterance. And there are cases that demonstrate that. Sure. I mean, I think it's limited to when he was exactly found by Francisco. And I'm saying, I'm not sure that it stopped at Francisco. It may have continued all the way to being in the ambulance and being in the hospital for the 15 or 16 hours that that took, or eight hours. I'm not sure exactly how long it took, but for the time that it took for him to get settled down. He's a 94 year old man. Certainly, Your Honor. Our position is just that he was once he was safely ensconced in the ambulance and later in the hospital. He was never at any point after that described as being hysterical or worried or even seeming to be in very much in pain. So he was just responding to these questions and what they described as as a reasonably calm manner. So the indications in the record are that he believed he was safe and that the emergency nature had passed. And so that therefore they were not excited utterances after the initial statements to Francisco. He was in an ambulance going to the emergency room that's not under emergency circumstances. As far as the case law talks about an ongoing emergency, they're referring to is there someone still on the scene who could be causing more harm? I worried about multiple individuals who are there. That's what ongoing emergency means in the context of excited utterances and testimonial hearsay. They did not rush him to the they were on site with him in an ambulance for quite some time before they then transported him to the hospital. Did you indicate earlier in your argument that you that it was your position that the statement that he made to Francisco was permissible, that that was properly admitted? Yeah, we acknowledge that that was, in fact, an excited utterance that was properly admitted. So if we got rid of all the other statements that he made, and we only had the statement to Francisco, why wouldn't that be sufficient? Because it's one statement from a man suffering from dementia. Instead of no evidence that this man was suffering from dementia. Where is that in the record? There is in his medical records testified to by Dr. Schuman. When he was hospitalized in January, there were signs of dementia. When he was hospitalized in July, he was in fact, diagnosed with dementia with encephalopathy and memory problems. I thought that all the evidence after that supported the conclusion that there was no finding of dementia. To the extent that when he was on scene in October, I forget the exact phrase that the medical personnel used, but he was oriented to time and place and manner. But that is different from dementia and memory problems. He was able to identify himself. He couldn't identify the medications he was taking. And he did have prior diagnosis of dementia. There are plenty of elderly people who can't identify the medications that they're taking because they're taking 20 of them. Does that mean that they have dementia? Not at all, but it can mean that there are some memory problems. I agree with Justice Copps. There was no diagnosis of dementia. What there was, was a note from Dr. Goldschmidt. We might want to, saying to the effect, we might want to test him for dementia at some other time, but no test was ever done. So there was no proper diagnosis. And the note saying, because a 94-year-old man is in the hospital, that would probably just be routine to see if he could live alone, for example, or if there are other indications that he was in trouble. Dr. Kim said he was not confused. Holliday said he was not confused. Galoshes, when he treated him at the time, earlier, said he was not confused. Can't say he had dementia, no assessment. Why are you telling us that there was a diagnosis of dementia? I mean, I have from Dr. Schuman's testimony that when Mr. Schuman was treating him, Dr. Schuman was reading from reports and papers. That was his opinion. It was not a fact. I mean, it's information that he relied on informing his opinions. But there was never a diagnosis by anybody who actually treated this man that he had dementia. I mean, I'm looking at my notes, and I have one from his hospitalization in July. In his hospitalization in January, he felt mixed up and was confused, and a doctor noted signs of dementia, memory, and executive function problems. Dr. Galoshe was the doctor who treated him, and he said no evidence, no evaluation. Can't say he had dementia, no assessment, and that's the doctor that treated him. Well, I'm sorry, Your Honor. I must have made an error in my notes, but we do still have the doctor in January who assessed him for social security after he had come in with a broken ankle from a fall and a hernia surgery, and he reported feeling mixed up and confused, and the doctor noted those were signs of dementia. He couldn't make an actual diagnosis because further testing was needed. Well, then it's correct to say there was no diagnosis of dementia, which you told us there was. Because I believe, based on what I'm looking at, that there was in July when he was hospitalized, but I could have been mistaken when I was taking that note, and I apologize, Your Honor. You know, it seems to me that if he had signs of dementia or issues with memory loss, give me a break. He's in his 90s, okay? That's just not surprising. I imagine that if he, let's say, one of the later conversations in the hospital, he said, Francisco did this to me. You might have a different position. You probably want that in, wouldn't you? Because he's inconsistent. Probably. I mean, perhaps it could come in with a limitation that it's only for impeachment. I don't know. It's probably still hearsay. Yeah, the point is, you know, here he is. He's 94. He's got a dresser over him. He's been beat up. Somebody's done this to him, and the first thing he says to his neighbor, who he has given a key to, somebody he trusts very well, the first thing he says is that Gilbert did this, okay? Then when he's asked later, Gilbert did it. It's not like he was confused about what happened or who did what. Everything he said was consistent, so if it were inconsistent along the way, you know, you might have a different argument, but he was consistent every single time he was asked. That's who he said did it. That's true, and that's why it was not harmless to allow in the multiple statements that he said to multiple different people after he had already been found. No, I'm sure all the evidence was not harmless against this man, okay? I get it, but it's also consistent from the beginning throughout the minimal amount of interviews that we're talking about, a handful of people. Certainly. I noticed that Dr. Schumann also did not refer to the fact that when this patient was being treated by Dr. Galausis, he was on painkillers. It was almost immediately after he was brought to the hospital, and he was on painkillers, Vicodin, and Haldol, which is a sedative, so the doctor may have thought, well, I can't make an assessment on dementia right now. I'll just put it in my notes to check this later, and then no assessment was made, but Dr. Schumann totally ignores the fact that the one doctor who actually spoke to this man after Dr. Kim in the emergency room made no assessment, and Dr. Kim didn't make an assessment. Dr. Kim said he was not confused, so I just don't see where you're going with that argument. I'm sorry. I was simply, I forget the exact nature of the question, but I was just trying to go down to why it was not harmless to have admitted those statements. Okay. Any other questions for my colleagues? None. Okay. Thank you. We'll hear from the state now. Thank you, Your Honor. Again, good morning, Your Honors. David Iskowich with the Cook County State's Attorney's Office on behalf of the people. At risk of repeating a standard of review that I'm sure this court has heard thousands of times on the challenge to the sufficiency of the evidence, the inquiry is whether the evidence, food and light, most favorable to the prosecution was sufficient to prove the elements of the crimes beyond a reasonable doubt. And narrowing that a bit further here, I would like to draw the court's attention to the jury instruction 7.15 with respect to the death of the victim and the issue of causation. The jury was instructed that to find that the defendant's acts caused the death of Stanley, that the acts were a contributing cause of death and that there was no intervening cause of death unconnected with the defendant. And to find defendant guilty under that theory, under that instruction, it was not necessary for the jury to find that the assault on Stanley was the sole or immediate cause of his death. So with that framework, the evidence showed that first, Stanley made statements implicating the defendant immediately upon his discovery by Mr. Del Angel. The statements he repeated five to six times were, Stanley did this to me, he took my wallet and he took my money. And these statements came in... Gilbert did this to me. Gilbert, I'm sorry. Yes, Gilbert did this to me. These statements came in and are in challenge here by the defendant. He repeated the statements in the ambulance to the EMT, Vicky Hernandez. He repeated the statement to the officer Alvarado, who was in the ambulance very briefly before the ambulance drove to the hospital. And again, he repeated the statement, Gilbert did this to me. Gilbert took my money at the hospital in the ER to Dr. Kim. Now questions about Stanley's credibility with respect to his identification of defendant are, any questions are up to the jury to decide. And that was a hotly disputed issue at trial. The jury came down on the side of the people with respect to the accuracy and the reliability and the credibility of Stanley's identification of the defendant. The dementia question, your honors already have explored to some extent. Nobody diagnosed Stanley with dementia. To the contrary, he was actually described consistently, not just by those who knew him, but by those who assessed him in the hospital on other occasions as generally coherent, a 94-year-old man who lived alone, who was able to do his own chores around the house with some help, a man who was not in any apparent cognitive decline. With respect to the January incident, the Dr. Galukas was conducted post-surgery for a hernia operation and penile discomfort. He was taking Haldol and Vicodin, as your honor mentioned. He was also coming down from an anesthesia. And he was also in the hospital and was assessed for purposes of social security and general well-being for a post-surgery elderly patient. Dr. Wycheck, in July of 2010, did not diagnose. Oh, if I might just back up quickly. Dr. Galukas expressly declined to diagnose Stanley with dementia. Dr. Schuman relied on those papers in somehow diagnosing dementia, but it's unclear how he arrived at that diagnosis, considering that Dr. Galukas, some 11 months before, had expressly declined to make that finding. So Dr. Schuman's opinion on that is not well taken, and the jury was free to reject it and was justified in doing so. As far as the cause of death, I just, referring back to the jury instruction, on the cause of death, the people needed to prove beyond a reasonable doubt that the actions of the defendant were the cause of, but not the sole cause of, and not necessarily the immediate cause of Stanley's death. Dr. Goldschmidt actually conducted the autopsy. He was there on the spot. He looked at the brain. He looked at the dura mater. He looked at the hemorrhaging, the bruising, the fluid collection. And following an overall assessment of Stanley's as a 94-year-old man who also had suffered from heart issues, acidosis, which is a chemical imbalance in the blood, hypoxemia, which is not enough oxygen in the blood, and hypovolemia, which is not enough oxygen to the brain, concluded that this confluence of disorders, which were exacerbated by the assault to his brain, were the cause of death. Balanced against that was Dr. Schuman's conclusion that the cause of death was solely related to a heart condition or gastrointestinal bleeding. Now, Dr. Goldschmidt didn't deny that there had been gastrointestinal bleeding and a heart condition. Stanley, in fact, had a pacemaker. But he declined to opine that those were the sole causes of death, and that looking at the whole package of a 94-year-old man who was viciously beaten about the head by the defendant, it was his conclusion that those brain injuries did, in fact, cause death. With respect to that, I note that the jury was free to accept or reject any part of the expert's testimony. So it very well could have found that, yeah, Dr. Schuman, he made a pretty good point about the gastrointestinal bleeding and about the heart condition. But we also believe that, as Dr. Goldschmidt testified, that initial assault to the brain and the hemorrhaging and the damage caused to the skull was at least a contributing cause, if not the sole cause. And it was a cause, if not an immediate cause. Just to move on to the other crimes evidenced, Your Honors, this is, of course, reviewed for abuse of discretion. The defendant maintains that the trial court's justification for its admission was improper, as he described it as a material to show a relationship between the defendant and Gilbert. And I guess that the trial court did say that, but if read in the entire context of the motions and the pleadings and the papers and the oral argument on this, the purpose of the admission of this prior bad act was to establish that, having assaulted Stanley in the past, the defendant was more likely to have continued that hostile behavior toward Stanley in the months forward after he was kicked out of the house, and that this went to show his intent and motive in robbing him and beating him and This evidence was introduced, was very subtle, and it was not prejudicial. There was no evidence concerning any discussions between Francisco, his wife, and Stanley about what exactly happened, but there was a chain of events on that day in March of 2010 that strongly suggested that the that that violence committed by the defendant had been regular and ongoing and culminated in the October 2010 beating and thrashing that he gave to Stanley. I am happy to answer any other questions that the court might have at this time. Questions or concerns? Thank you, Your Honors. Okay, we'll hear from a public defender, please. Appellate defender. Certainly. Just two quick points, Your Honors. First, the medical examiner's opinion was rebutted by evidence that Lekiewicz's hypertensive heart disorder and history of falls pre-existed. M.E. claimed that his health began to decline after October when, in fact, the records demonstrated that his health had been in decline for quite a while. He had a history of falls for the year ahead of time and a long-term heart problem. And also, I just want to underscore that with two doctors said that the cause of death was wholly unrelated to those head injuries, fully rebutting the medical examiner's opinion on that. I'll otherwise stand on my briefs unless Your Honors have questions. Okay, thank you very much for your arguments and your briefs. We appreciate it. Well done, as always. And we will take the matter under advisement, and you'll be hearing from us in a matter of weeks. And we are adjourned. Thank you very much.